On behalf of the Appellant, Mr. Richard Johnson. On behalf of the Appellee, Mr. Stephen Peskin. Mr. Johnson, you may proceed. Thank you, Your Honor. Good morning, Your Honors. May it please this Court, my name is Rich Johnson. I represent Rich White. This is an appeal from a judgment that was entered in the Circuit Court of King County on November 9th of 2009 by Judge Brewer. It's a divorce matter, but we're here on financial issues, all issues relative to the children having a child. There are several issues presented to the Court for its review. They are set forth in detail in Mr. White's brief on page 2. There are two primary issues to be addressed this morning in argument, and those are as follows. First, the Court's valuation of Mr. White's one-third interest in his company, Richard Wilcox, was against the manifest weight of the evidence. And two, the award of maintenance in the allocation of the marital estate as a result of that valuation, and the judgment that was entered against Mr. White for that amount is also against the manifest weight of the evidence. If I have time, I will address the additional issues that are set forth in the brief. Judge, the Court, Your Honors, the Court's valuation of Mr. White's one-third interest was determined to be $1,976,000. As I stated, it's against the manifest weight of the evidence. Mr. White hired Mr. Patrick McNally as his expert. Ms. White retained John Coffey as her expert. Both experts used the income approach toward valuation. Basically, they both projected the annual gross income available to the shareholders into perpetuity. Into perpetuity must be remembered. After they both determined what that annual cash flow is, they apply a capitalization rate, and it turns out to be the projection rate of return, which then leads to a valuation of the per share value. Both experts specifically and categorically rejected the transaction approach to valuation. They said it was unreliable. There were no recent sales of comparable businesses, and as a result, they did not use it or address it as part of their valuations. This is where we have an issue with what the Court did. The Court, in this opinion, actually used the transaction approach to reach a determination of value. How did the Court do that? Well, in the written order and opinion of the Court, the Court said, use simply as a layman. He then went and proceeded to- There was a prior experience in referring to the purchase of the building or the business in the building, but in his explanation of arriving at a value and also a judgment, it seemed to me that that was just a reference and that was to use the expert testimony, which then that utilized comparables or comparables to arrive at a judgment on the value of the business. Judge, if you review his opinion order, I would respectfully disagree. What he did was he took the purchase price, which was what the company was purchased in 2003. He subtracted a building that was sold. He then subtracted the outstanding debt with the corporation and came with it within a dollar number, which he thought was the equity, and then simply divided it by three. This is the actual transaction method that the experts said was unreliable and they did not use. Did he make a statement that he thought that Mr. Coffey was the most reliable expert? No, he did not. He said both experts were reliable. Both experts were credible. But to change my wording, didn't he make a statement that he thought that Mr. Coffey's opinion regarding the value of the business more closely resembled his experience? Something. What he basically said, Judge, I did my evaluation by using this recent transaction method, which both experts vehemently rejected, and then accepted Mr. Coffey's number because it was closer to his than Mr. McNally's number. Wasn't one of the other criticisms, though, that Mr. McNally used the period which included the worst performing months in a five-year period? Wasn't that one of the criticisms? No, it was not. Both experts basically testified with regard to the decline in the industry, laying off 25 percent of the workforce, a decline in sales of approximately 40 percent, and used those numbers. The issue that we need to address further, and I think it will explain it, Justice Paquette, is once Judge Brewer accepted Coffey's number, then what he did was he took that number, divided it into 50 percent, and it comes up with a value that is approximately a million dollars, $988,000. The problem with Mr. Coffey's evaluation is that it is fundamentally flawed. Both experts relied on the treatises of John Hitchner, who they both said was the foremost authority in valuating closing-out businesses. What Mr. Hitchner said, a common mistake made in business valuation is to capitalize cash flow into perpetuity, where depreciation greatly exceeds future capital expenditures. Isn't the use of a reference by an expert as an aid to coming up with an opinion just nothing more than that? And the fact finder can weigh that and put whatever weight he wants on to that point. It's not determinative of any type of error. And you obviously know that we're not accountants and we're not experts in evaluating businesses. So as long as the opinion of the court is within the testimony of the experts, and we're using a manifest weight view, how do you get around that? You have to get to the point where there is a critical flaw in the determination of value in Mr. Coffey's report. And I can explain that. Okay. And basically, what Mr. Coffey did was, if you look on page 17 of the report, his report in excerpt is on page 17 of the brief. In determining the annual cash flow of the business, he set the depreciation at $1.1 billion. He then subtracted from that depreciation, I mean capital expenditures into perpetuity by only $400,000. So what we have is a $700,000 difference in value. What that does, Judge, is it overstates the cash flow, which then overstates the value of the company. Is there a problem, Mr. Johnson, with Coffey not using the 2009 numbers? No, there's no. It's the formula that's the concern here. It's not the numbers. If both experts followed Mr. Hitchner's requirement and used capital expenditures equal to depreciation, the difference in their ultimate value would only have been $114,000 apart. So the main issue is that there's this critical flaw in Mr. Coffey's evaluation. And simply speaking, if you have an asset, you buy a car that's worth $20,000, you can only depreciate $20,000 worth of value. If you apply Mr. Coffey's equation to this, you would actually purchase the car for $20,000 but be able to depreciate $45,000. And as a result, you can't depreciate more than what the asset costs. So the critical flaw is going into perpetuity. And the perpetuity is how you value this. The capital appreciation and the depreciation need to be or have to be zero. They have to balance each other out. Otherwise, you get into a situation where there's a negative asset value, which is impossible. So that's the issue with regard to Hatchner's number. Now, after accepting Mr. Coffey's number, which we believe is an error against the manifest weight of the evidence, he entered a judgment against Mr. White for 50% of the value of his shares. And this was the amount that's close to $2 million. The judgment amount bears interest at 9%. In his order and opinion, the court said, I know that Mr. White can't write a check, and he hoped that he could go out and get a loan for $1 million to pay this judgment off. We made a calculation that to pay this off over 20 years at 9%, it would cost Mr. White close to $9,000 per month. So when you add, so he did this, and then he did this only after he set the child support and maintenance amounts before and after the marital residence sold. So, before the house sold, if you take his child support Well, that's an arguable point. It's the one that was set. He made, apparently, a decision on all three points at the same point in time. So, in other words, he decided child support, maintenance, and then the amount that the husband owed for business. But it was made all at the same time. You have to use inference to decide that he violated the rule that you shouldn't award child support and maintenance until you have all the capital assets and know what all the assets are that are available for distribution. Is that the point you were trying to make, or am I off? No, you're exactly on the point, Judge. But if you look at his opinion in order, what he did is he took the child support and maintenance figures. That's the first thing he decided because he wanted to know what was going to be paid before the marital residence was sold and what was going to be paid after the marital residence was sold. The court then, by awarding a judgment later on, if you look at his opinion, the amount of the value of the judgment is one of the last things he did in his written order and was subsequently put into the judgment. The judge abused his discretion by basically awarding the maintenance, awarding the support, and then dividing the marital estate without considering the impact of the interest that this judgment bears. And as a result of that, Mr. White, before the marital residence was sold, as well as after the marital residence was sold, will be paying 100% of his net income to satisfy these obligations of the judgment. He will have no other income to support himself or to support his children. As I recall, the court found he had a net of $17,000, and in round numbers, 50% went to child support and maintenance. And, of course, child support has a limit. And there's also a review of maintenance in the two-third year period after three years. What's your recommendation regarding how whatever value that was placed on the business should be paid? Our recommendation is the court should have accepted the opinion of Mr. McNally and then did its calculation with regard to that value. And in the event that Mr. White, at a reduced value, could obtain a loan, he would attempt to do so. The alternative, which was suggested in our brief as well, is to give Miss White the 50% of those shares and have her continue on as a shareholder in the business. And since this is a subchapter S corporation, any distributions made to Mr. White for his remaining 25 of his 50 would also be made to Miss White, so that she would receive. How would that work, Mr. White and Mrs. White in business together? Well, what... Don't try to steer away from that type of thing. The court's definitely trying to steer away, but what we need to consider here is that Mr. White only has a one-third interest in this business. He has two other shareholders that have a majority interest, and they want to make sure they get their distributions. They could care less whether or not Mr. White's situation. They want to make sure that they get paid, and as a result, she would get paid if she had shares in the corporation. You're taking the position that doing it that way would be one-half of a one-third loan of the corporation. Correct. Under the subchapter S taxation procedure, would she have to pay income taxes on the eloquent part? Yes, but what the corporation has historically done, they've made a distribution of additional income to pay those taxes. So the net effect is whatever their distribution is, that's what they get in cash. So, judging light, in wrapping up, Mr. White respectfully requests that if you review the maintenance, review the allocation of the marital assets, in light of the valuation and the judgment was entered against them, it's against the manifest weight of the evidence, and it's an abuse of discretion, and it's an inequitable requirement for Mr. White to satisfy a judgment which he can't afford to pay, because 100% of his income is used to satisfy his obligations. Thank you. Thank you. If you want us to read that. Now, if O'Malley was there and you did that. I'm sorry? If Judge O'Malley were still here and you put that up without losing a part, your fingers would be hurt. Because O'Malley would have hit your hand. I'm sorry? Now that it's up, and I can't read it from here. I think I might be able to help. I don't know if you did it. It is, with the court's permission, it is a blow-up of a page from Mr. Coffey's report that was replicated in the briefs. So the courts have the brief in front of them. Page 17. Let's see. From this point forward, that page 17 of your brief should have it. Okay. So this is an Austin exhibit? The report is the Petitioner's Exhibit 12, which is the report of John Coffey. And it's page 43 of the Coffey report. I believe it's 12. It may be 11, but I'm pretty certain it's 12. Anybody have any comments? No. All right. May I proceed? Thank you, Your Honor. May it please the Court, I'd like to start my remarks working backwards from the comments that the Court had asked Mr. Johnson, specifically with regard to making Mrs. White a partner of Mr. White, a one-sixth owner of this business. Respectfully, Your Honor, on behalf of Mrs. White, we would suggest that that is really a very untenable situation. I mentioned in my brief, it's extremely unlikely that Mr. White is seeking a new business partner. He's simply attempting to avoid paying Mrs. White her share of this business interest. I pointed out some of the situations that could arise. For example, the partners of the business, Mr. White and his two partners, could create a new class of stock, effectively emasculating Mrs. White's share. The partners could start to perk themselves money as opposed to taking distributions, leaving Mrs. White out of the cold. Now, I'm not saying, and there certainly was nothing in the record indicating that there would be any conspiracy, but I think the Court, using its common sense, could realize why that is untenable. The case law has fairly consistently indicated that that is not a good idea in terms of former spouses remaining as co-business owners. The policy of the Illinois Marriage and Dissolution of Marriage Act is to separate parties wherever possible, so it's our opinion that that is not a practical solution. You had asked the question before that, what should Judge Brew have done? And that, I think, is a key question here. He really took a situation with not a lot of options. There weren't offsetting assets. Well, let me pose one option. Yes. What if you took split the husband's shares, 50-50, and then put the wife's 50 percent into a trust and set a fixed value on that? And as part of the agreement relative to the accord order, you'd have to redeem a certain amount of those shares per year. And it may be able to work it out so that based on the quality of the business, the income the business is making, it would increase but not decrease. And that would be one more reasonable way, I think, to get to handle it than putting an amount of numbers of $1 million judgment on top of it and earning 9 percent per year for an illiquid asset that the record reveals can't be sold. It obviously has some loan value, but based on the record you can't tell what the loan value is. So when you read it, you read this husband has half of his income going towards child support and maintenance, which leaves him approximately one half of $17,000 per month to take care of the million-dollar judgment and then keep him on the same level playing field as the wife. You raise a couple of points in those comments. I'm really not quickly able to understand the concept that the court threw out. We're not looking to profit beyond what Judge Brewer had ordered here. That may be a viable solution. I think the reason that the judgment made some sense was if Mr. White doesn't have the resources, he's not bound to a specific payment plan. They arbitrarily in their brief and today in the argument as well said if we amortize the judgment over 20 years at 9 percent, he's going to owe $9,000 a month, thus he would have no additional income. That's not what Judge Brewer required in this particular judgment. And in effect, what Mrs. White is getting is a piece of paper, which is an order, a court order that says he has to pay it, but not in any particular schedule. I also ask the court to take a look at the record in terms of the past years of income. There's a judgment against the husband that could be enforced by the wife. That's true. She could, if he buys a house, she could attach the house, enforce the judgment against the house. Whatever he does, that judgment could be enforced against whatever asset he has. And it just doesn't seem to me initially, without making up my mind, it just seems the judges imposing the high judgment on him as the way to pay for the wife's interest in the stock creates a lot of problems. And as you point out, there are other problems created by if he just gives the wife the stock. It should be more than just giving the wife the stock. There has to be some other order that regulates the sale of that disposition of the stock. I would ask the court to take a look at his historical earnings from the business. And the tax return reflects the tax returns for a number of years, substantial excess income beyond his regular salary as determined by Judge Brewer. And I'm not going to pretend to know what Judge Brewer was necessarily thinking, but I'm assuming that he was thinking there are these excess distributions that had been made with some regularity. But he didn't set that out. I'm sorry? Judge Brewer never set that out. He did not. And that's what I'm saying. I don't know what Judge Brewer specifically was thinking. I'm just saying the record reveals substantial payments beyond the amount that Judge Brewer determined the income to be. What is the purpose of things like that, memberships in golf courses, payments for cars? And he seemed to not get involved in that because in some ways, if I were the judge, it would increase the problem. Well, and we're not challenging that. There is additional income floating around. We're just saying that the tax returns in the record reveals that there are substantial distributions that were made to Mr. White in excess of the amounts Judge Brewer had determined his base income was. Let me ask, what about the criticism that Mr. White has raised regarding the coffee's flawed assumption that depreciation will outpace capital expenditures? What about that? Thank you, Your Honor. This issue was raised vigorously by Mr. White throughout the trial using both his expert as well as cross-examining Mr. Coffey. The record of the trial reflects Mr. Coffey patently denying on at least three occasions throughout the record that that's what he did. Mr. Coffey testified that he followed to a tee Professor Hitchner's formula, who was one of the authorities, one of the foremost authorities in the nation. That is the program that has been adopted by the National Association of Certified Valuation Analysts. Mr. Coffey testified, I just went to a seminar. I'm following that protocol to a tee. Mr. Coffey testified that this is the protocol of the AICPA, and I'm following that as well. It's in the brief. It's in Petitioner's 12. But this shows, despite what Mr. Johnson had indicated to the court, there was $1,000,0126 that was deducted as part of the normalization process because we don't pay tax on depreciation. But then it was added back in lower in this spreadsheet. Again, I apologize. I know the graphic is too small for the court to see, but it's in the brief. And we dispute, and Mr. Coffey disputed, that there was any impropriety, that there was no flaw. He basically, the difference between the two calculations was this. The way that Mr. McNally undertook this task was he determined what the historical depreciation of the entity was, and he adjusted the capital expenditures going forward to equal the past depreciation. Mr. Coffey said that's problematic because the past depreciation isn't an accurate reflection of what the future capital expenditures would be because it includes depreciation on assets the company no longer owns, which was primarily the building. So that's a skewed figure. What we're really looking to do here is to determine what the future capital expenditures are because that would be less the investor would have to put in his pocket if they have to pay for these capital expenditures. And the best way to do that is to look at what the past capital expenditures were. There was not, as suggested, an impropriety with that practice. In fact, it's a concrete way of determining the future capital expenditures. Look at the past capital expenditures, not the abstraction of depreciation. So, again, I would, and I'm sure the court already has, to review the testimony of Mr. Coffey where he was repeatedly grilled on this issue and insisted that he did not do that. And, again, I would remind the court that Judge Brewer heard these two experts testify for, I think, cumulatively four days. And he had the ability to weigh the discrepancies in their testimony. Didn't Judge Brewer, he heard them testify with respect to the income approach. And then when he reached a figure, Judge Brewer wasn't using the transactional approach? No. I don't believe so, Your Honor. And I know that's what they had urged on the court before. And I mentioned this in my brief. Judge Brewer almost was thinking out loud in his decision. He was weighing whose expert made more sense in the real world. And he was musing to himself in his decision when he said, well, they bought this business for $15,200,000 in 2003. It was more literal in the direction of that type of general statement. He said, I have, in essence, a recent contract referring to the building that was, the business that was purchased. That's right. For $15,200. That's right. And that created a problem and allowed the appellant to argue that the judge was using a specific asset for purposes of his determined value. In other words, it wasn't just a pure income approach. But I think the significant line in the decision was, after he went through that vignette, he more or less concluded by saying, and this is the reason that I believe Coffey's report makes more sense. I mean, the court can read it, obviously, as the court sees fit. But it appeared from our reading that it was really kind of amusing by Judge Brewer in his own mind in how he was rationalizing why Coffey's analysis seemed to make more sense. Well, there are certain legal principles that apply or presumptions that apply to court rulings. And they'll be applied, I think, with respect to our disposition. I'd also remind the court to take a look at the Grunston case, which I had cited in my brief. Because in that particular case, they said that it was actual error for a trial judge not to consider a similar transaction with regard to the business asset issue, which was a few years earlier. And there's nothing improper under valuation law for a trial court to consider a variety of things in coming up with its ultimate conclusion. The court can consider on its own, despite the experts applying an income approach. The court can consider an asset approach or a transactional approach or anything within reason. And the question is whether or not the ultimate decision is against the manifest way of the evidence. And we would, again, assert that despite the near facto nature of the argument that Coffey screwed up his analysis, he really didn't. And the record shows it was thoughtful. It was methodical. He cited references. He cited books. He cited articles. And the record in its entirety reveals that the judge certainly was acting reasonably to accept his opinion. Correct me if I'm wrong. Coffey came up with an approximately $50 million value based on his original analysis and then further testified that using the other experts, McNally's basis, it would come out to $19 million. Is that correct as part of the? Judge, I reviewed the record pretty substantially, and I just don't remember that particular comment. I know actually during the record, because what they were valuing was a one-third interest. Mr. Wett's one-third interest. And Judge Brewer actually said to Mr. McNally, tell me what the entire interest is worth. And at that point, McNally said $9 million. And I think we offered testimony later in response to that that Coffey said he thought the entire entity was worth $15. That's what I'm talking about. Yes. And then the add-on to what I said was that Coffey further testified that by using McNally's analysis, he would come up with a figure of $19. And, of course, the court's figure came up to approximately $19, I believe. The judge's value was, I thought, $15 million. Judge Brewer basically adopted. Was it $15 million? Yes. I think Judge Brewer adopted Coffey's analysis for what the one-third interest of the business was, $1.8 million, thereabout. But I don't think the judge made a specific finding that the entity itself was worth any particular sum. The time is up. And we recognize that this is a complicated case and the rules provide for limited oral argument time. But we'll work it out. Okay. Thank you. And I'm sorry about putting the exhibit up without court permission. Do you want me to take it down now or should I leave it up? Oh, use it, counsel. If he's going to use it, we'll leave it up. Sure. I'm going to try to address the issues pretty briefly. Mr. Johnson, you might want to speak in that microphone. Okay. Sorry. I'd like to use the exhibit a little bit if I could. Would you mind if I brought it a little closer? No, you may. Okay. The issue that we have correctly raised in our brief is we agree that this depreciation and amortization number needs to be added back. That's this 1.12. But to get to cash flow, which is this bottom line figure, you have to make certain subtractions to that. What Mr. Coffey did, and this is directly from his report, is he only subtracted $410,000 in capital expenditures. So these two amounts are not equal, and that's what Hitchner said needs to happen when you calculate this number going into perpetuity because you cannot depreciate more than you spend. And if you only buy $400,000 worth of assets, you can't depreciate $1.1 million. So that's the flaw in his valuation. Thank you. Judge, one of the first things you mentioned was an option to purchase or redeem shares. And there is some case law to support that, and that would be a way that you could satisfy or give Ms. White the shares and require Mr. White to purchase them over time without this onerous judgment bearing 9 percent interest. Because if Mr. White, as the Court's aware, doesn't start paying today, that 9 percent has been running since last November and will continue to run. How do you get past the shareholders' agreement, the corporation agreement? Isn't there a right for the shareholders to purchase first? There is. We'd have to work that out with the shareholder, between many shareholders. So, I mean, for the Court to order him to turn over shares to her, does the Court have jurisdiction or authority to do such a thing? Well, I think if the Court does then, the shareholders would have a put option and would have to buy the shares at that price. So that would be the best of all worlds because the corporation would buy the shares and not Mr. White, and Ms. White would get her money, corporate them later. I think the agreement provides that if one of the owner's shares are offered for sale, it's first offered to the corporation, the subject, or its corporation, that they refuse to buy and they have a stated stock market value, per share value, which they establish annually and which is not indicated by the record. But if the corporation refuses to purchase, then the shareholders each individually or as a group have the right to purchase the shares. And in Article 10, if the shareholders of Holder's don't purchase it, Article 10 of that agreement provides for disposition of shares to other than stockholders or the corporation. And under the language of that agreement, it does mention a trust. So I assume that a trust was an option for disposing of shares under the stock purchase agreement. Yes, if the corporation and the shareholders, the trust would be an option. We should have to go through a step process to get down to Article 10 of that agreement. Sure. One further comment, Judge, and I struggle with this. I saw Judge Brewer's opinion, but I reviewed the record, I reviewed Mr. McNally's report, and nowhere did I find in the record or in Mr. McNally's report that $9 million was ever a figure that he used for the corporation. In fact, he had used a $15.2 million value before he applied, reduced the debt, and applied his discount, similar to what Mr. Coffey did. I think that kind of shows that the judge might not have understood Mr. McNally's testimony when, in his opinion, he put that Mr. McNally valued the company at only $9 million and that no one would pay $9 million for this company. One final comment. The Grunstein case… Was your point that McNally did not put a value of $933,000 on it? No, $933,000 for Mr. White's interest, but he never valued the company as a whole at $9 million, is what I meant to say. The Grunstein case says, sure, the court can come up with a value within the range of what the experts, but they said that has to be within the manifest weight of the evidence, and it's clear from the arguments in the brief, the arguments here today, that the court accepted a value that was fundamentally flawed, does not correctly and accurately reflect the value of the corporation Mr. White's went through. Thank you. Thank you.